IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF LOGAN J. ET AL.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF LOGAN J. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ERIKA J., APPELLANT, AND ERIC F., APPELLEE AND CROSS-APPELLANT.


Filed December 7, 2021.    Nos. A-21-249, A-21-250, A-21-254.


Appeals from the County Court for Scotts Bluff County: JAMES M. WORDEN, Judge. Affirmed.

Andrew M. Pope, of Crites, Shaffer, Connealy, Watson, Patras & Watson, P.C., L.L.O., for appellant.

Danielle Larson, Deputy Scotts Bluff County Attorney, for appellee State of Nebraska.

Audrey M. Long, of A. Elliott Law, P.C., L.L.O., for appellee Eric F.


MOORE, BISHOP, and ARTERBURN, Judges.

MOORE, Judge.

## I. INTRODUCTION

Erika J. appeals, and Eric F. cross-appeals, from an order of the Scotts Bluff County Court sitting as a juvenile court, terminating their parental rights to three of their children. Upon our de novo review of the record, we affirm the juvenile court's order.

- 1 -

## II. STATEMENT OF FACTS

### 1. PROCEDURAL BACKGROUND

Erika and Eric are the parents of Roper F., born in February 2017. Erika is also the mother of Logan J., born in February 2015. Eric is also the father of Tannen F., born in December 2009. Logan's father and Tannen's mother are not a part of the appeal before us now, and they will only be discussed as necessary to address Erika's and Eric's assigned errors.

In September 2019, a petition was filed with the Sioux County Court, sitting as a juvenile court, to adjudicate Tannen, Logan, and Roper pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) based on the action of both parents. Specifically, the petition alleged that Eric assaulted Logan with a belt, causing severe bruising on Logan's legs, and that Erika failed to report the assault to law enforcement and failed to protect the children in her home. Tannen, Logan, and Roper were removed from the parental home on September 6, 2019, and placed with a foster family. Tannen was later placed with his biological mother in April 2020. In November 2020, Tannen's biological mother began fostering Logan and Roper. All three children have remained out of Erika's and Eric's home since their removal.

### (a) Eric's Motion for Visitation

On September 26, 2019, Eric filed a motion that "request[ed] the court adopt a reasonable parenting time schedule" for Eric. On September 6, Eric was arrested for criminal child abuse related to the allegations in the adjudication petition. Due to the pending child abuse case, a "no-contact provision" between Eric and all three children had been ordered by the criminal court as a requirement of Eric's bond. The details of this "no-contact provision" are not included in our record. Eric's motion was heard by the juvenile court on October 4. Evidence was presented by both the State and Eric, including testimony by the Department of Health and Human Services (DHHS) initial assessment worker and the two law enforcement officers who investigated Logan's bruising on September 6. In an order entered on October 15, the court allowed Eric supervised visitation with Tannen and Roper, with the amount of the supervised visitation to be determined by DHHS. The court also continued its previous order that Eric have no visitation with Logan.

On April 16, 2020, Eric motioned the juvenile court to remove the "no contact provision" and allow visits between him and Logan. Eric cited his compliance with DHHS' case plan prior to the plan being court-ordered as evidence that he was taking the reunification process seriously.

### (b) Adjudication

The following day, the State filed an amended petition which stated that Eric engaged in "excessive discipline" and that Logan received severe bruising on his legs "as a result of a belt used by Eric . . . " The adjudication hearing was also held on April 17, where both Erika and Eric entered pleas of no contest to the allegations in the amended petition. The juvenile court then found that Tannen, Logan, and Roper were adjudicated under § 43-247(3)(a).

### (c) Disposition

The juvenile court entered its dispositional order on May 1, 2020. The court adopted the DHHS case plan which outlined managing mental health, providing age appropriate parenting, and developing positive relationships as plan goals for both Erika and Eric. The court then modified

the no-contact order to allow for therapeutic visitation between Eric and Logan. The court also ordered "[r]easonable visitation to be determined by DHHS. Further visitation conditions are: Continuing as determined by HHS." Neither Erika nor Eric appealed the court's dispositional order.

### (d) Eric's Suspended Visitation

On July 28, 2020, DHHS halted supervised visitation between Eric and Tannen and Roper, as well as therapeutic visitation between Eric and Logan. DHHS cited Eric's inappropriate behavior with the children, Eric's recent assault charge in an unrelated matter, and recommendations by therapeutic providers as reasons why contact between Eric and the children was stopped.

On July 30, 2020, Eric filed a motion for emergency orders on visitation, arguing that the juvenile court had "illegally delegated" its visitation authority to DHHS when the court allowed DHHS to determine reasonable visitation in its dispositional order. A hearing on Eric's motion for emergency orders was held on August 14. Betsy Goodell, the family's DHHS case manager from September 2019 until September 2020, testified that DHHS was concerned by Eric's erratic behavior towards professionals on the case, letters from two therapists recommending that visits between Eric and the children stop, as well as Eric's general lack of participation in his case plan goals. Goodell also testified that the clinician who had performed Eric's parental capacity evaluation advised that therapists involved in the case were the best source to determine visitation progress. Eric testified in his own behalf and described the parenting classes he had completed. Eric also denied inflicting the injuries on Logan's legs. The juvenile court temporarily suspended visitation between Eric and all three children and took the matter under advisement, noting that it would attempt to issue a decision as to Eric's visitation before the scheduled review hearing on September 4.

### (e) Motion to Transfer

On August 14, 2020, Eric filed a motion to transfer jurisdiction to Scotts Bluff County. On August 31, the juvenile court, on its own motion, continued the review hearing and Eric's motion to transfer jurisdiction from September 4 to October 2. All parties then filed a joint stipulation to transfer jurisdiction and the order by the Sioux County Court transferring jurisdiction was filed on September 14. The Sioux County Court had not ruled on Eric's motion for emergency orders on visitation at the time of the jurisdictional transfer.

### (f) Motion for Termination of Parental Rights

On September 29, 2020, the State filed a motion in Scotts Bluff County Court, sitting as a juvenile court, for termination of Erika's and Eric's parental rights, alleging statutory grounds to terminate existed pursuant to Neb. Rev. Stat. § 43-292(2) and (6) (Reissue 2016), and alleging that termination was in the best interests of the children.

### (g) Eric's Motion for Video Visitation

Prior to the termination trial, Eric motioned the juvenile court for video visits with Tannen and Roper, and a hearing on the motion was held on November 30, 2020. Eric reoffered certificates of completion for various courses he had participated in and testified to the video capabilities in

the jail for virtual visits, as Eric was incarcerated at the time of the hearing. At the close of the hearing, the court ordered that Eric begin therapeutic visitation with Tannen and Roper for 1 month, and then move to supervised visits with Tannen and Roper.

## 2. TRIAL

The termination trial was held over the course of 3 days in January 2021. At the trial, 26 witnesses testified and over 30 exhibits were received by the juvenile court.

### (a) Logan's Injuries

Law enforcement was called to Logan's preschool on September 6, 2019, to investigate possible child abuse caused by Eric. An officer testified to hearing Eric tell Logan that Eric was sorry and that he did not mean to hurt Logan after Eric was informed by law enforcement that they were investigating Logan's injuries. An officer who observed the bruising on Logan's legs testified that the bruising was on both of Logan's thighs and appeared to be in various stages of healing, as some of the bruises were lighter in color. Officers also noticed that the bruise on Logan's left thigh contained a particular pattern, as the bruise had a hole in the center that appeared to have been made by a belt. A secretary at Logan's preschool testified that the bruises on Logan were the worst bruises she had ever seen on a child and that she had observed a buckle impression on Logan's thigh. Eric was later arrested for criminal child abuse.

The DHHS initial assessment worker contacted law enforcement and organized a forensic interview, which took place the same day the injuries were reported. The worker observed the child forensic interview of Logan and testified that Logan disclosed that his "daddy had . . . hurt him . . . with a belt." When Logan was asked in the interview what Erika did after the incident with the belt, Logan responded that "Mommy said no more TV for Logan." Tannen also had a child forensic interview. The worker testified that she found Tannen's interview responses to be coached.

The initial assessment worker also testified that neither Erika nor Eric would provide explanations for how Logan's injuries occurred. Another DHHS worker who assisted with the case intake, testified that Erika later attributed the bruises on Logan's legs to his wrestling with Tannen and stated that "Logan's never been known for his gracefulness." Erika also told the workers that while the children are spanked in the family home and that Eric does the physical discipline, Eric has never left a bruise on the children. Throughout the case Erika has denied ever seeing the bruises on Logan's legs, reporting she had only seen them in photographs shown to her. Erika testified that the bruises were never revealed to her because Logan was bathing and dressing himself in September 2019.

Throughout the case, Eric gave various explanations for Logan's injuries. Goodell stated that Eric explained that Logan's fall onto a baler caused his bruises. In August 2020, Eric told his counselor that he spanked Logan with his bare hands. At the time of the termination trial, Eric testified that he spanked Logan with the strap of a duffel bag. When asked why Eric would spank Logan with a duffel bag strap, Eric stated, "[t]hat is the question of the year."

### (b) Children's Therapeutic Services

Melissa Bauer-Post, a licensed mental health practitioner, facilitated therapeutic visits between Logan and Eric in July 2020. Bauer-Post noticed in her initial sessions with Logan that he needed permission to do everything during play therapy. Bauer-Post testified that during the first therapeutic visit, Eric struggled to follow Logan's lead and did not stay to discuss the session after it had ended. A second therapy session was scheduled, but Bauer-Post received a call the night before the session from DHHS, informing her that Eric had arrived to the children's visitation intoxicated and that the session would need to be canceled. The second session was rescheduled, but Eric did not show up. Bauer-Post called Eric to inform him that she would not be facilitating any more therapeutic visits between him and Logan. Eric then became very angry and threatened Bauer-Post with his attorney.

Bauer-Post became Logan and Roper's individual therapist in October 2020. Bauer-Post testified that Logan is diagnosed with ADHD, an adjustment disorder, anxiety, and depression. Roper also has an adjustment disorder and anxiety. Because of these childhood mental health struggles, both boys need permanency, stability, and normalcy. Bauer-Post testified that because both Logan and Roper display a high level of fear, it is likely they suffered past trauma, being yelled at, and living in immense fear.

Dr. Sue Michal, a mental health therapist, began seeing Tannen on December 4, 2019. Michal observed Tannen to be protective of Eric and that Tannen had "learned codependency." Michal testified that Tannen has been "groomed" by Eric to minimize Eric's actions, even if Tannen knows the acts are "probably illegal." Tannen will often come to his father's defense, saying that no one understands how bad Eric has it. Since Eric was incarcerated in September 2020, Michal has noticed Tannen to be more calm and stable. Michal testified that she recommends Tannen not have contact with his father until he reaches the age of majority. Michal recounted Eric's criminal behaviors, domestic violence, and teaching Tannen to minimize Eric's behavior as reasons why she recommends Tannen have years of "noninfluence" from his father.

### (c) Domestic Violence

The domestic violence dynamic between Erika and Eric has been a presence throughout the case. On February 12, 2020, law enforcement was called to their home due to a domestic disturbance. An officer who arrived on the scene observed lumps on Erika's forehead and testified that Erika indicated that Eric tried to put her in a chokehold and she "jabbed" Eric with car keys in order to free herself from him. Erika then left the residence but returned after receiving a call from Eric. The officer testified that when Erika returned to the home, Eric punched Erika's lip and stomach. The officer was unable to interview Eric because he was so intoxicated. The officer observed broken items throughout the house, the bedroom in disarray, and a significant amount of blood on the kitchen floor. Eric was then arrested for strangulation and domestic assault.

In her testimony about the February 2020 incident, Erika acknowledged that in April, she wrote a letter recanting her initial report to police, stating that Eric had not hit her. At trial, Erika clarified that Eric had put her in a chokehold, but that it was not a "full chokehold."

Eric did not testify about the February 2020 incident. Throughout the case Eric denied using physical violence against Erika, but Eric's counselor testified that Eric acknowledged that he bullies Erika.

As discussed below, Eric was incarcerated for periods of time throughout the case. After Eric was arrested on September 6, 2019, for criminal child abuse, law enforcement began listening to jail calls between Eric and Erika. An officer testified that during the calls, Eric was attempting to control Erika and provide her with a false narrative for law enforcement and the courts. The tone of these jail calls revolved around Eric pressuring Erika to frame the child abuse allegations in a favorable way for Eric.

Officers also contacted women who had previously been in a relationship with Eric. These women identified as victims of Eric's domestic abuse, including instances of strangulation. Officers also contacted law enforcement in states in which Eric had previously resided, and received a report of a domestic violence investigation involving Eric and his wife at the time. Officers testified to relaying their concerns regarding the domestic violence between Eric and Erika to DHHS.

Goodell testified that when she confronted Eric about his domestic violence history, he denied domestic violence ever occurring in the home. DHHS remained concerned about domestic violence in the case, but when Goodell attempted to address the concerns with Erika, she denied it.

Caroline Teeple, the DHHS case manager for the family from September 2020 onward, testified that in a conversation with Erika in October, Erika indicated that she was not "completely done" with Eric. After Eric was incarcerated in September, Teeple requested copies of jail calls between Eric and Erika and observed 176 phone calls within a 1-week period.

Later, in November 2020, Erika reported to Teeple that she had cut off all communication with Eric. However, Teeple testified to a jail call on November 17 in which Eric asked another detainee to call a third party to relay a message to Erika for him. There were also six calls made on November 17 during which Eric used another detainee's line in an attempt to hide his contacts with Erika. During one of these calls, Teeple testified to Erika telling Eric, "in order for me to get the kids back everyone has to believe it and I have to cut all ties with you." Later in the call, Eric referenced a plan the couple had to "remain a family."

Teeple testified that DHHS's concerns regarding the family included a lack of sustainable behavioral change and continued safety threats over a year into the case. Domestic violence concerns contributed to a worry that Eric would continue to abuse the children, and Erika would be unable to protect the children from serious harm. Teeple rated both Eric and Erika's case progress as poor.

Erika testified about her relationship with Eric generally and the difficulty she has had in ending the relationship due to her fear of him and her lack of community supports. Erika stated that Eric mentally abused her by blaming her throughout the case and making everything out to be her fault. Erika testified to having taken steps to address DHHS's concerns by not communicating with Eric, changing her phone number, changing her address, and planning to file for divorce when she is able to afford it.

(d) Other Criminal Cases

Both Erika and Eric spent a portion of this case incarcerated. Erika was incarcerated from May 8 to August 10, 2020. Teeple testified that she had learned that Erika was arrested on January 7, 2020, for theft and on May 6 for a false reporting charge related to the February domestic assault.

In addition to Eric's arrest in February 2020 for domestic assault and strangulation, Teeple testified that Eric was sentenced on September 9 to 18 months for attempted child abuse and to 6 months for assault of a minor. The two sentences were ordered to run consecutively. While Eric's charge of attempted child abuse was related to Logan's injuries, his charge of third degree assault was related to a case involving Eric's contacts with a 16-year-old juvenile. A law enforcement officer testified that the allegations of the case included Eric picking up the juvenile from her high school and driving her to a nearby parking lot where he fondled and kissed her. Following a forensic interview of the juvenile, Eric was arrested. The officer also noted that Erika stated that she was aware that Eric had been contacting a younger girl at a high school.

(e) Erika's Visitation

Goodell testified that Erika attended nearly all of her visits from September through December 2019. Erika was able to move from fully supervised to semi-supervised visits in October. However, DHHS returned Erika to fully supervised visits in January 2020 after a family support worker saw Eric in the home when there was a no-contact order between Eric and Logan. Erika's visitation was then halted from May to September due to her incarceration.

When Teeple took over the case, Erika's visitation attendance was less consistent than it had been before her incarceration. Teeple testified that Erika attended, on average, 81 percent of her visits from September to December 2020.

Tina Campos, a family support worker who supervised Erika's visits with her children, began working with the family in September 2020. Campos stated that Erika was initially engaged with the children, was able to keep them on a nap and eating schedule, and was prepared for the visits. However, in October, Campos observed a change in behaviors from Erika and the two children. Erika would have a few positive visits with the children followed by a visit that went poorly, with Erika being unable to sustain positive visits consistently. Beginning in October, Erika also began to use her phone as a form of escapism when she would become frustrated during visits. While there were no noted safety concerns during visits, Campos testified that Erika's frustration would cause her to shut down during her visits with Logan and Roper.

(f) Erika's Therapeutic Services

Dr. Gage Stermensky, a licensed psychologist, conducted a parental capacity evaluation for Erika in December 2019. Stermensky testified that Erika had the capacity to meet the urgent or emergency needs of her children, but only if it does not lead to upsetting or finding herself out of favor with significant others. Stermensky diagnosed Erika as having dependent personality traits, and was concerned that Erika would seek out significant others that would place her or her children at risk. Stermensky testified that Erika did not present with any concerns regarding intellectual function, but that there were mental health issues that would require Erika to comply with a treatment plan and long-term therapy.

Maria Saenz, a licensed psychotherapist, met Erika in August 2019 when Erika voluntarily came to see Saenz for assistance with her mental health concerns. Saenz scheduled Erika for weekly sessions, but Saenz only saw Erika for 13 sessions between then and October 2020. Saenz testified that Erika's inconsistency with attendance made Erika's sessions ineffective as each session was like starting over and there were always new issues to address. In her last session with

Saenz, Erika did disclose that Eric had abused the children, but Erika never disclosed that Eric had abused her. Saenz testified that it is common for a client who is experiencing abuse in the home to be sporadic with treatment attendance.

Erika was referred to Community Action Partnership of Western Nebraska (CAPWN) in July 2019 for therapeutic services and medication management. In her individual diagnostic interview on July 3, Erika disclosed that she was struggling with anxiety and mood deregulation, as well as past emotional abuse, sexual abuse, and a current sexual assault investigation pending at the time of the interview. Further evaluations indicated that Erika was struggling with depression and anxiety related to having her children removed. Erika started medication management services with CAPWN, but professionals testified to being unable to fully address the reactions Erika was having to her prescribed medications. While it was recommended that Erika receive counseling and mental health therapy during her medication management services, professionals noted that Erika not being properly medicated hindered her ability to move forward with her therapy.

Cory McManigal, a licensed alcohol and drug counselor with CAPWN, was Erika's individual counselor beginning in January 2020. In sessions with McManigal, Erika disclosed her concerns that her alcohol consumption was becoming increasingly problematic. In addition to individual sessions, Erika completed a substance abuse intensive outpatient program with McManigal from February to April. McManigal testified that Erika was developing coping skills and working on setting boundaries with Eric. Erika was incarcerated from May to September and sought McManigal out for counseling after her release. However, Erika stopped attending counseling sessions in October despite future sessions being scheduled.

### (g) Couple's Counseling

Erika and Eric began couple's counseling in April 2020. Their counselor saw them twice, once in April and then again in September. The couple did not disclose Eric's arrest for domestic violence against Erika.

### (h) Eric's Therapeutic Services

Stermensky also conducted a parental capacity evaluation for Eric in December 2019. Stermensky diagnosed Eric with an unspecified anxiety disorder, antisocial personality traits, an unspecified alcohol-use disorder, and an alcohol-related disorder and advised that Eric attend individual therapy and follow therapeutic recommendations. Stermensky testified that if Eric did not follow therapeutic recommendations, it would affect his ability to function well in the parenting role, Eric's other relationships, and Eric's ability to meet various goals.

Eric was likewise referred to services at CAPWN. A provider at CAPWN conducted a substance use evaluation on Eric in October 2019 and diagnosed him with an alcohol-use disorder. It was recommended that Eric receive weekly outpatient treatment from the provider who had performed the evaluation. However, Eric returned for outpatient treatment only twice after his evaluation, both times in November 2020.

Eric began receiving medication management services at CAPWN in September 2019. The provider offering Eric's medication management testified that managing Eric's medication was difficult as he would increase dosage amounts on his own and was generally not medication compliant. Eric was receiving medication management services until his incarceration. Providers

also testified that medication without accompanying therapy will not effectively meet the needs of the patient.

Eric saw an individual counselor for a few sessions before discontinuing treatment because he believed the therapist was "prying into information into Erika, and [Eric] felt that it was inappropriate." Eric then transitioned to Sandy Raney, a counselor dually licensed in substance abuse and mental health, in August 2020. Raney testified that she performed a co-occurring evaluation on Eric, as well as a domestic violence assessment after Eric disclosed he had a domestic violence charge. Raney advised Eric to participate in anger management and domestic violence classes. Eric participated in five sessions with Raney prior to his incarceration.

Raney testified that Eric was inconsistent with his disclosures. Eric was also not sincere in acknowledging that he had an anger problem, and Raney stated that she "was being played to get him out of trouble with DHHS and get on with his life." At one point, Eric informed Raney that he wanted to divorce Erika so that she could retain custody of the children. Eric never attended any of the groups that Raney recommended. Raney stated that Eric made very minimal progress on his treatment plan. Raney testified that it would not be beneficial for the children or Eric to have any visitation at the time of trial. If Eric was not able to manage his anger, Raney predicted that the children would grow into "little Erics."

### (i) Eric's Inappropriate Behavior

Various witnesses described Eric's inappropriate behavior towards adults involved in the case and at visits with his children. Both Logan's preschool secretary and the children's foster mother testified to inappropriate and sexual remarks Eric had made to them.

Goodell noted concerns regarding inappropriate conversations between Eric and the children as well as comments made to the visitation workers. Inappropriate conversations consisted of talking with the children about the family's child welfare case and making sexual comments to workers. The April 27, 2020, DHHS court report also notes Eric calling the children inappropriate names and speaking to Tannen about pornography.

### (j) Leave to Amend Termination Motion

At the close of the second day of trial, the State made a motion for leave to amend its motion to terminate parental rights to include an allegation under § 43-292(7), alleging that the children have been in an out of home placement 15 out of the most recent 22 months. Erika and Eric objected to the State's motion for leave to amend. The court took the State's motion under advisement. During the final day of trial, the court heard argument from all parties and found that the State's motion for leave to amend, to include the allegation under § 43-292(7), would not prejudice the parties and allowed the State to amend its original motion.

### 3. ORDER

Following the termination hearing, the juvenile court entered an order on March 2, 2021, terminating Erika's rights to Logan and Roper and Eric's rights to Tannen and Roper. The court found that the State had met its burden of proving grounds for termination under § 43-292(2), (6), and (7). The court further found that "[t]he only thing that has been corrected in this case is Logan's

physical injuries have healed" and that it was in the best interests of the children to have Erika's and Eric's parental rights terminated.

Erika appeals, and Eric cross-appeals.

## III. ASSIGNMENTS OF ERROR

Erika assigns, restated, that the juvenile court erred in (1) allowing the State to amend the petition at trial to include the statutory ground under § 43-292(7), (2) finding that there was clear and convincing evidence that statutory grounds for termination existed, and (3) finding that it was in the best interests of the children to terminate her parental rights.

Eric cross-appealed, assigning, restated, that the juvenile court erred in (1) delegating its authority to the DHHS to determine reasonable visitation, (2) allowing the State to amend the petition at trial to include the statutory ground under § 43-292(7), (3) finding that there was clear and convincing evidence that statutory grounds for termination existed, and (4) finding that it was in the best interests of the children to terminate his parental rights.

As a preliminary matter, we note that Eric failed to comply with the rules regarding cross-appeals. See Neb. Ct. R. App. P. § 2-109(D)(4) (rev. 2021). Eric properly designated the cover of his brief as a cross-appeal, but he did not set forth his cross-appeal in a separate division of the brief as required by § 2-109(D)(4). However, because Eric's brief complies with the rules regarding an appellant's brief and does not take issue with any errors asserted by the appellant, in our discretion, we treat Eric's brief as a brief on cross-appeal.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

## V. ANALYSIS

### 1. DELEGATING VISITATION AUTHORITY

First, we address the only issue argued by Eric but not by Erika. Eric assigns that the juvenile court erred in delegating its authority for determining visitation to DHHS. Eric asserts that this delegation of authority violated the law and his due process rights, as DHHS made a unilateral decision to halt his visitation without any oversight by the court and which interfered in his constitutional rights to raise his children.

Before deciding whether the juvenile court improperly delegated the authority to determine Eric's right to visitation, we must determine whether we have jurisdiction to address this assigned error. In a juvenile case, as in any other appeal, before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). For an appellate court to acquire jurisdiction of an appeal, there must be a final order entered by the court from which the appeal is taken. *Id.* Juvenile court proceedings are special proceedings under Neb. Rev. Stat. § 25-1902 (Reissue 2016), and an order in a juvenile special proceeding is final and

appealable if it affects a parent's substantial right to raise his or her child. See *In re Interest of Octavio B. et al., supra*. The Nebraska Supreme Court has held that dispositional orders are final and appealable. *In re Interest of Taylor W.*, 276 Neb. 679, 757 N.W.2d 1 (2008).

In its dispositional order entered on May 1, 2020, the court provided that Erik's visitation was to be determined by DHHS. This order was final and appealable, and thus should have been appealed within 30 days. See, Neb. Rev. Stat. § 43-2,106.01(1) (Reissue 2016) (any final order or judgment entered by juvenile court may be appealed to Court of Appeals in same manner as appeal from district court to Court of Appeals); Neb. Rev. Stat. § 25-1912 (Cum. Supp. 2018) (appeals must be filed within 30 days after entry of judgment). Eric did not appeal the court's May 1 order; rather, he moved for emergency orders on visitation on July 30, 2 days after DHHS suspended visitation between Eric and Tannen and Roper. Because Eric did not appeal within 30 days of the May 1 order, we do not have jurisdiction to address this assignment of error.

Eric contends that he did not appeal the dispositional order because the goals outlined from the case plan were "appropriate and reasonable." Brief for cross-appellant at 29. Eric argues that if he had appealed the court's dispositional order, the case would have stalled for an additional 6 months, which would have denied Eric the ability to reunify. Thus, Eric chose the "lesser of two evils" in opting to work with DHHS. Brief for cross-appellant at 30.

We are not persuaded by this argument. The Nebraska Supreme Court has previously held that one may not waive an error, gamble on a favorable result, and, upon obtaining an unfavorable result, assert the previously waived error. See *Ecker v. E & A Consulting Group*, 302 Neb. 578, 924 N.W.2d 671 (2019). Eric had 30 days to appeal the juvenile court's dispositional order and may not appeal the order now, after obtaining an unfavorable result.

In his brief, Eric argues various other errors by the juvenile court with respect to visitation that he did not specifically assign as error. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *In re Interest of Joezia P.*, 30 Neb. App. 281, ___ N.W.2d ___ (2021). We have not addressed any alleged errors that were argued but not assigned.

### 2. ALLOWING LEAVE TO AMEND MOTION

Erika and Eric both assign that the juvenile court erred in allowing the motion for termination of their parental rights to be amended during the course of trial. The original motion regarding termination of Erika and Eric's parental rights stated two grounds for termination of those rights, § 43-292(2) and (6). On January 14, 2020, at the end of the second day of the trial, the State requested leave to amend the pleading by adding an additional statutory ground to the motion, alleging that the children were within the meaning of § 43-292(7). The juvenile court granted the State leave to amend.

In its order terminating Erika's and Eric's parental rights, the juvenile court found, among other things, that the children were within the meaning of § 43-292(7). Erika argues that she did not receive proper notice of the third statutory basis in the amended petition and as such, did not have a reasonable opportunity to refute the allegation. Eric argues that the State could have amended its petition at the time of pretrial but chose not to, which compromised his defense and violated his due process rights. Both of these arguments fail.

A trial court may conform the pleadings to the facts proved when an amendment does not change substantially the claim or defense. The decision to allow such an amendment rests with the discretion of the trial court and will not be error unless prejudice resulted. *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997). Prejudicial error results when a pleading is allowed to be amended where the amendment changes the issues and affects the quantum of proof as to any material fact. *Id*.

The juvenile court's granting leave to the State to amend the pleadings to conform to the evidence did not substantially change the subject matter or issues that were addressed at the termination hearing. A significant amount of evidence was presented to support the State's allegations under § 43-292(2) and (6). The only evidence that was required to be proven under the new subsection (7) was the amount of time the children had been in out-of-home placement, a matter that was not in dispute. Rather, the evidence to support this allegation was straightforward and did not impact the parents' defense to the termination motion. Erika and Eric were clearly aware of how long the children had been in out-of-home placement. Erika and Eric participated in the hearing and had ample opportunity to address and rebut all the evidence presented. We see no prejudice in permitting the State to add a claim to the pleadings which conformed to the evidence the parties presented and had ample opportunity to address.

### 3. TERMINATION OF PARENTAL RIGHTS

For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). The State must prove these facts by clear and convincing evidence. *Id*.

### (a) Statutory Grounds for Termination

The juvenile court found that the State had presented clear and convincing evidence to satisfy § 43-292(2), (6), and (7) with respect to both parents. Erika argues that the State's evidence focused primarily on Eric's actions and his minimal progress in the case. Therefore, Erika asserts that the State failed to prove the statutory grounds in the original petition, § 43-292(2) and (6), were met. However, both Erika and Eric acknowledge that their children have been out of their home for at least 15 of the most recent 22 months.

As discussed above, we find that the juvenile court did not err in allowing the State to amend the petition to include the statutory ground under § 43-292(7). Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *In re Interest of Kenna S., supra.*

Here, it is undisputed that the children have been in out-of-home placement for 15 or more months of the most recent 22 months. The children were removed from their parents' home on September 6, 2019. The State filed its motion for termination of parental rights on September 29, 2020, and moved to amend its petition to include the § 43-292(7) statutory basis during the

termination trial in January 2021. At the time of trial, the children had been out of their parents' home for 16 months. Thus, the statutory requirement for termination under § 43-292(7) has been met.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). Because the State presented clear and convincing evidence that Tannen, Logan, and Roper had been in an out-of-home placement for 15 or more months of the most recent 22 months, statutory grounds for termination of Erika's and Eric's parental rights exists.

(b) Best Interests With Respect to Erika

Erika assigns that the juvenile court erred in finding that it was in the children's best interests to terminate her parental rights. In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the children. § 43-292; *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016). Because the parent's right to raise his or her children is constitutionally protected, the court may terminate parental rights only when the State shows that the parent is unfit. *In re Interest of Isabel P. et al., supra.* There is a rebuttable presumption that the best interests of the children are served by having a relationship with their parent. *Id.* This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.*

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). While both are separate inquiries, each examines essentially the same underlying facts. *Id.* In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Becka P. et al., supra.* In cases where termination of parental rights is based on § 43-292(7), appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. *In re Interest of Becka P. et al., supra.*

As the juvenile court noted in its termination order, Erika's case is sympathetic because to "some degree, she is a victim of [Eric], just as her children." However, the record shows that Erika has been more willing to protect Eric from harm than she is her children. Despite acknowledging that Eric spanks the children and performs physical discipline in the household, Erika denied that Eric caused injury to Logan. At the time of trial Erika continued to deny even seeing the bruises on Logan, as she claims he was bathing and dressing himself at four years old. Erika's recanting of the domestic abuse she suffered in February 2020 led to the dismissing of Eric's strangulation charges, but led to Erika being incarcerated for 3 months for false reporting. During her incarceration, visitation with her children was halted. The record additionally showed Erika knew Eric was contacting a juvenile in high school but Erika did not intervene or cease her relationship with Eric.

In November 2020, Erika told her case manager that she was separating from Eric. However, jail call records indicate that Erika and Eric were attempting to communicate discreetly, by using third-parties to relay messages and using the phone lines of other detainees to avoid detection. Erika also alluded to a plan to convince professionals on the case that she had separated from Eric in order to receive custody of her children. A few months later at the termination trial, Erika said that she had cut off contact with Eric and was planning to divorce him. Assuming this radical change in the couple's relationship status was true, Erika's separation from Eric occurred well over a year after her son suffered severe injury by Eric, and this effort to create a safe household comes too late. Last-minute attempts by parents to comply with the rehabilitation plan do not prevent termination of parental rights. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020).

Since Eric has been incarcerated, case professionals have noted a decreased engagement between Erika and her children. Erika's visitation attendance has dropped and she has been unable to sustain consistently positive visitations. When Erika grows frustrated, she retreats into her phone. It is concerning that reports of Erika shutting down at visitation began immediately after Eric was incarcerated.

Additionally, because of Erika's dependent personality traits, there is a concern that Erika will continue to seek out significant others that will place her or her children at risk. Erika was minimally compliant with her therapeutic services and there is little evidence that Erika has sufficiently managed her dependent personality traits. While Erika was compliant with medication management and did complete her substance abuse intensive outpatient program, she did not consistently participate in individual therapy. Erika was scheduled for weekly therapy sessions, but attended only 13 sessions in 16 months. Erika's therapist testified that these sessions were largely ineffective, as each time Erika returned to therapy it was like starting over. Erika also attended couple's counseling only twice and did not disclose Eric's domestic assault arrest, Erika's false reporting arrest and incarceration, and Eric's pending prison sentence. The couple's therapy sessions were likely of little benefit due to the inconsistent attendance and lack of disclosure. In total, Erika has not engaged in therapy sufficiently to cause any long-term sustainable change.

Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015). Based on the evidence presented, there has been minimal change in Erika's behavior over the course of the case, and based on Erika's continued alignment with Eric and her inconsistency with individual therapy, she is unlikely to change in the future.

Further, Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). Logan and Roper have been in foster care since September 2019. They deserve stability in their lives and should not be suspended in foster care when Erika is unable to rehabilitate herself and show that she is able to provide a safe environment for her children. Accordingly, we find there was clear and convincing evidence to show that Erika was unfit and that terminating her parental rights was in the children's best interests.

(c) Best Interests With Respect to Eric

As the juvenile court noted, photographs of Logan's injuries show excessive abuse. The bruises on Logan's legs covered the entirety of his thighs and evidenced separate incidents as the bruises were in various stages of healing. At the start of the investigation, when confronted by Logan's injuries, Eric apologized and indicated he did not mean to hurt Logan. Eric thereafter denied inflicting the injuries and later offered alternative explanations for how the injuries occurred. Finally, at the termination trial, Eric admitted to beating Logan with a belt of some kind but was unable to answer why the beating had occurred.

Eric's domestic abuse reaches beyond Logan's injuries. Throughout the case there has been evidence of Erika suffering domestic abuse by Eric. Most notably was the domestic violence incident in February 2020, for which Eric was charged with domestic assault and strangulation. Eric's control over Erika was also displayed through her willingness to recant her report of Eric's abuse and state, instead, that he did not put her in a "full chokehold." Even while Eric was incarcerated, there was constant communication with Erika; Eric would pressure her into presenting a false narrative to authorities involved in Logan's child abuse case and at one point, called Erika 176 times in 1 week. Law enforcement's investigation also produced several of Eric's past romantic partners who claimed to have been victims of his domestic abuse. Throughout the case, Eric denied there was any domestic violence occurring in the home.

Tannen's therapist described her concerns with the parent-child relationship between Eric and Tannen. She testified that Tannen had been "groomed" by Eric and had learned codependency. Tannen was willing to minimize Eric's actions, even if the actions were wrong or illegal. Tannen would also defend Eric and state that no one knew how bad his father had it. The therapist's concerns were so great that she recommended Tannen have no contact with Eric until he reached the age of majority when he would be better able to protect himself against Eric's manipulation and grooming. Logan's and Roper's therapist testified to the children experiencing childhood trauma. Because the children seek permission for every action, it is likely they were constantly yelled at and lived in immense fear of Eric. Eric was unwilling to meaningfully engage in therapeutic visitation with Logan, and when Logan's therapist terminated the service, Eric threatened her.

Eric has also displayed inappropriate behavior throughout the case. He made sexual remarks to the children's teachers, foster parents, and visitation workers. Eric also called the children names and spoke to Tannen about sexual subjects. Eric was arrested in March 2020 for sexual contact with a high school student.

Finally, Eric has been unable to effectively work with substance abuse counselors or mental health providers. After Eric was diagnosed with an alcohol-related disorder and was set up for weekly substance abuse counseling, Eric attended two sessions in November 2019 and never returned. Throughout his medication management services, Eric would increase his dosage beyond the prescribed amount. Eric acted as though he knew more than the health professionals and was not medication compliant.

Eric's individual counselor testified that Eric's progress was very minimal. Eric was inconsistent in his couple's therapy attendance and did not disclose recent domestic violence events between himself and Erika. Eric was also not sincere in acknowledging that he had an anger

problem and did not attend any of the groups his counselor recommended. Because Eric was unwilling to acknowledge his anger issues, his counselor was concerned that Eric's behavior in the home could create three "little Erics" in the children. Eric's own counselor did not recommend visits between Eric and the children at the time of the trial. Eric has been unwilling to engage in case services and has not placed himself in a position to reunify with Tannen or Roper. See *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015) (where parent is unable or unwilling to rehabilitate herself within reasonable time, best interests of child require termination of parental rights); *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015) (Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity). Therefore, we find there was clear and convincing evidence to demonstrate that Erik was unfit and that terminating his parental rights was in the children's best interests.

## VI. CONCLUSION

Upon our de novo review of the record, we conclude the State proved by clear and convincing evidence that grounds for termination of Erika's and Eric's parental rights existed under § 43-292(7) and that termination of their parental rights is in the children's best interests. Accordingly, the juvenile court's order is affirmed.

AFFIRMED.